Gates, McDonald and Company v. Commissioner.
Gates, McDonald & Co. v. Commissioner
Docket No. 11440.
United States Tax Court
1947 Tax Ct. Memo LEXIS 226; 6 T.C.M. (CCH) 435; T.C.M. (RIA) 47111; April 28, 1947
*226 Donald C. Power, Esq., and Sidney D. Griffith, Esq., Columbus, Ohio, for the petitioner. Clarence E. Price, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies: Declared
Excess-
Income
Value Excess-
Prof-
Year
Tax
Profits Tax
its Tax
1941
$2,181.26
$2,088.81
$ 4,251.73
1942
5,521.75
32,823.72
The deficiencies resulted from numerous adjustments but the only issue raised by the petitioner is whether the Commissioner erred in disallowing a portion of deductions taken in each year for the compensation of two stockholder-officers. Findings of Fact The petitioner is an Ohio corporation with principal office at Columbus, Ohio. Its tax returns were filed with the collector of internal revenue for the 11th district of Ohio. The petitioner was organized in 1931 as the successor to a partnership which had been formed in 1929 by Charles M. McDonald, Frank Gates, and E. E. Lerch. During 1941 and 1942 the petitioner was engaged in performing a type of actuarial service in connection with workmen's compensation and unemployment compensation matters. *227 It rendered services to many nationally known corporations throughout Ohio and within an area bounded roughly by New York, Minnesota, and Tennessee. Service was rendered by correspondence in other states. The petitioner's business was built upon a service which had been developed and promoted by Gates and McDonald. The object of the service was to procure the full advantage of merit rating for employers who contributed to workmen's compensation funds. It consisted of an improved method of compiling, evaluating, and controlling individual loss experience. It included the checking of past losses, classification changes, payroll audits, safety measures, claims procedures and reserves. The petitioner represented employers before compensation boards. In 1938 a similar service was devised in connection with unemployment compensation. This service was performed in a separate department of the petitioner. The petitioner charged a fee for its services which was calculated at the rate of about 21 cents per $100 of each client's payroll in connection with unemployment compensation matters and at the rate of 10 per cent of each client's annual premium payments in connection with workmen's *228 compensation matters. Its fee was higher than the amount charged by its competitors. Its service, however, was more detailed than that rendered by its competitors. Each year the petitioner showed a net gain in clients and in 1942 the petitioner had about 650 clients. The petitioner's officers and the members of its board of directors from 1931 through 1942 were as follows: Charles M. McDonald - President Frank Gates - Vice-President Harold E. Sinclair - Secretary-Treasurer Mary Rittman - Assistant Secretary-Treasurer McDonald was in charge of sales, personnel and administration. He was primarily responsible for the promotion and sale of the petitioner's service. He was a certified public accountant and had been employed as an accountant until 1922. He then became engaged in the real estate business in Columbus. In 1928 he had an income from that business of approximately $9,000 to $11,000. Gates had extensive experience in workmen's compensation matters. He was in charge of the technical operation of the petitioner's business. He had been employed by Emile Watson who was a consulting actuary in Columbus. Sinclair assisted McDonald. He succeeded Gates as vice-president *229 in 1943 although the latter remained in the employ of the petitioner until 1945. His duties were then divided and performed by several other employees. The petitioner employed an average of ten employees including officers in the years 1931 through 1936. The officers, key employees, and additional salesmen, auditors and clerks, averaged 18 in 1937, 22 in 1938, 29 in 1939, 33 in 1940, 34 in 1941, and 37 in 1942. Lerch, who was one of the original partners, did not render any services. He advanced about $40,000 total cash to the partnership and the petitioner. The petitioner was incorporated at the suggestion of Lerch. Originally, 240 shares of stock at $100 par value were issued. The former partners each received one-third of the stock except two qualifying shares. McDonald and Gates gave notes to Lerch for the amount of their stock. Lerch also received notes of the corporation for approximately $14,000 to $16,000. McDonald and Gates each acquired one-half of Lerch's stock after his death. From 1934 through 1942 McDonald and Gates each owned one-half of all the petitioner's stock except two qualifying shares. All notes were fully paid to Lerch's estate not later than 1937. *230 On January 6, 1941, the board of directors fixed the salaries of McDonald and Gates for 1941 at $26,580 each. On December 15, 1941, the board authorized payment of bonuses as follows: McDonald and Gates, $17,500 each, Sinclair, $1,950, Rittman, $1,200, other employees, $9,450 to be distributed at the discretion of McDonald and Gates. The total compensation thus authorized during 1941 for McDonald and Gates was $44,080 each. On January 5, 1942, the board of directors fixed the salaries of McDonald and Gates for 1942 at $26,580 each. On May 18, 1942, these salaries were increased to $50,000 each. The minutes of this meeting recite in part as follows: The President announced that the meeting had been called for the purpose of reporting on the progress of the business of the Company to date; the hiring of additional personnel and the increasing of salaries commensurate with the progress of the business and the services performed, as well as a distribution of a bonus to the officers and employees of the Company, covering the first four months of 1942; and the transaction of such other business as may be properly brought before the Board. Mr. McDonald reported that because of the *231 fact that 80% of the Company's clients seemed to be now engaged in direct war work, it was deemed advisable to place a liaison man in the field, whose sole duty it would be to confer with each client personally, to discuss with him classification changes, safety measures, payroll distribution and proper claims procedure, and that Mr. John Cantlon was chosen for this position with very gratifying results to date. * * *
Mr. McDonald also stated that with increased payroll, increased personnel and the volume of detail involved in the performance of work in behalf of the clients, it has become necessary for the officers and some of the employees to work overtime. Consequently, Mr. McDonald recommended that it would be proper at this time to increase the salaries of the employees and the officers. After a general discussion, on motion duly seconded and carried, effective as of May 15, 1942, the salaries of the officers were fixed at the following amounts until further action of the Board of Directors: Charles M. McDonald, Pres-
ident
$50,000.00
Frank Gates, Vice President
50,000.00
Harold E. Sinclair, Secretary-
Treasurer
9,600.00
Mary Rittman, Assistant Sec-
retary-Treasurer
5,100.00
*232 On motion duly seconded and carried, the matter of increase in salaries to the employees was referred to Mr. Gates and Mr. McDonald for action. The board then ordered the following bonuses to be paid as of May 21, 1942: McDonald and Gates, $12,500 each, Sinclair, $1,500, Rittman, $1,000, other employees, $8,600 to be distributed at the discretion of McDonald and Gates. On September 3, 1942, additional bonuses were authorized. The minutes of this meeting recite in part as follows: Mr. McDonald announced that the meeting had been called for the purpose of reporting on the progress of the company's business for the months of July and August; the distribution of a bonus to the executive officers and employees; and the transaction of such other business as may be properly brought before the Board. Mr. McDonald stated that the months of July and August continued to show considerable increase in work to be performed, which made it necessary because of the Draft for the key people still with the Company to work harder, with some night work. He further stated that the profit for eight months ending August 31, 1942, amounted to $28,204.82. A discussion was had as to the possibility *233 of paying a bonus to the executive officers and employees. Upon motion of Mr. Gates, duly seconded and carried, it was agreed to pay bonuses in cash and in the form of Defense Bonds on or before September 15, 1942, or as soon thereafter as possible. * * * The board then authorized payment as follows (shown at cost values): McDonald and Gates, $10,000 each, Sinclair, $1,125, Rittman, $1,125, other named employees, $9,318.75, plus $525 in cash to Sinclair and two other employees. The total compensation thus authorized during 1942 for McDonald and Gates was $72,500 each. The amounts of compensation for McDonald and Gates which were deducted by the petitioner in its returns for 1941 and 1942 and the amounts allowed and disallowed by the Commissioner are as follows: Amount
Amount
Amount
1941
Deducted
Allowed
Disallowed
McDonald
$ 44,080.00
$36,600.00
$ 7,480.00
Gates
44,080.00
36,600.00
7,480.00
Totals
$ 88,160.00
$73,200.00
$14,960.00
1942
McDonald
$ 60,717.45
$40,250.00
$20,467.45
Gates
60,717.45
40,250.00
20,467.45
Totals
$121,434.90
$80,500.00
$40,934.90
The amounts of compensation deducted in 1941 and 1942 for McDonald *234 and Gates were approved by the Wage Stabilization Board. The following table shows the total compensation of the petitioner's principal officer-stockholders and all other employees for the years 1931 through 1942: Year
McDonald
Gates
All Others
Total
1931
$ 6,000.00
$ 5,000.00
$ 17,752.92
$ 28,752.92
1932
7,150.00
4,958.36
16,348.58
28,456.94
1933
9,200.00
7,000.00
11,564.44
27,764.44
1934
18,400.00
16,600.00
16,875.80
51,875.80
1935
25,080.00
23,280.00
16,289.84
64,649.84
1936
27,830.00
26,030.00
20,868.34
74,728.34
1937
32,980.00
32,980.00
30,857.92
96,817.92
1938
26,580.00
26,580.00
44,240.33
97,400.33
1939
30,580.00
30,580.00
59,943.69
121,103.69
1940
33,080.00
33,080.00
70,092.54
136,252.54
1941
44,080.00
44,080.00
84,379.93
172,539.93
1942
60,717.45
60,717.45
110,924.65
232,359.55
The following table shows the petitioner's gross receipts, salaries, and net income (or loss) before taxes for the years 1931 through 1942: Net Income
Gross Receipts
(or Loss)
Net Income
Workmen's
Social
Before
Total
(or Loss) Be-
Year
Compensation
Security
Receipts
Salaries
Salaries
fore Taxes *
1931
$ 46,275.66
$ 28,207.59
$ 28,752.92
$ (545.33)
1932
40,561.54
25,825.93
28,456.94
(2,631.01)
1933
46,232.43
29,929.38
27,764.44
2,164.94
1934
70,037.16
57,115.51
51,875.80
5,239.71
1935
81,417.30
70,716.45
64,649.84
6,066.61
1936
96,574.25
79,686.68
74,728.34
4,958.34
1937
125,151.56
102,281.19
96,817.92
5,463.27
1938
120,501.47
$ 10,777.96
$131,279.43
97,907.21
97,400.33
506.88
1939
120,314.83
43,445.79
163,760.62
123,512.35
121,103.69
2,408.66
1940
125,911.72
57,149.71
183,061.43
141,670.41
136,252.54
5,417.87
1941
146,412.34
79,699.88
226,112.22
183,216.66
172,539.93
10,676.73
1942
181,991.13
111,777.52
293,768.65
250,268.60
232,359.55
17,909.05
*235 The following table shows the petitioner's net income (or loss) after taxes with additional adjustments to surplus (or deficit), ultimately reflected in its net worth for the years 1931 through 1942: Additional
Net
Accumulated
Net Income
Adjustments
Adjustments
Surplus
(or Loss)
to Surplus
to Surplus
(or Deficit)
Capital
Net
Year
After Taxes
(or Deficit) *
(or Deficit)
as Adjusted
Stock
Worth
1931
($ 545.33)
($15,791.54)
($16,336.87)
($16,336.87)
$24,000.00
$7,663.13
1932
(2,631.01)
(9,836.34)
(12,467.35)
(28,804.22)
24,000.00
(4,804.22)
1933
1,630.51
624.42
2,254.93
(26,549.29)
24,000.00
(2,549.29)
1934
4,171.52
4,171.52
(22,377.77)
24,100.00
1,722.23
1935
4,957.80
(.03)
4,957.77
(17,420.00)
24,100.00
6,680.00
1936
4,159.81
4,159.81
(13,260.19)
24,100.00
10,839.81
1937
4,565.56
70.73
4,636.29
( 8,623.90)
24,100.00
15,476.10
1938
313.90
313.90
( 8,310.00)
24,100.00
15,790.00
1939
2,023.97
950.11
2,974.08
( 5,335.92)
24,100.00
18,764.08
1940
4,339.31
1,624.26
5,963.57
627.65
24,100.00
24,727.65
1941
7,542.04
7,542.04
8,169.69
24,100.00
32,269.69
1942
7,841.25
(1,980.56)
5,860.69
14,030.38
24,100.00
38,130.38
*236 The petitioner did not pay any dividends to its stockholders during the years 1931 through 1942. Opinion LEMIRE, Judge: The question for determination is what constitutes a reasonable allowance for the compensation of McDonald and Gates for services rendered to the petitioner in 1941 and 1942, within the meaning of section 23(a)(1)(A) of the Code. The tables given in the findings of fact show a steady growth *237 in the petitioner's business. Its gross receipts (in round figures) increased from $46,200 in 1933 to $293,700 in 1942. During the same period its net income, before the payment of salaries and bonuses, increased from $29,900 to $250,000. Its salaries and bonuses increased from $27,700 to $232,300. Thus, most of the increases in net profits were absorbed by increases in salaries and bonuses. A small surplus was accumulated but no dividends were paid. McDonald and Gates were the principal officers and sole stockholders of the petitioner. They and two junior officers were the board of directors. While their compensation was fixed by action of the board from year to year, it was not fixed by bargaining at arm's length. During the taxable years they owned stock, and received salaries and bonuses, in equal shares. They received more than the total of all other salaries and bonuses paid to some thirty employees. At the beginning of each taxable year their combined salaries were fixed at $53,160. In 1941 they received total compensation of $88,160 - an increase of $35,000. In 1942 they received total compensation of $121,434.90 - an increase of $68,274.90. The additional compensation was *238 based primarily upon the increases in the petitioner's net profits. It was not based upon any profit sharing contract. The petitioner seeks to justify the compensation in question mainly on the grounds that the petitioner was in the business of rendering personal services, that McDonald and Gates were responsible for its success, and that capital played an insignificant part in its business. With respect to capital it is impossible for us to make any determination. We are told that approximately $40,000 was used in promoting the business. We are not told exactly how it was spent. It may or may not have produced income during the taxable years. In any event the question before us concerns the personal services actually rendered by McDonald and Gates to the petitioner during the taxable years. The facts show that they originated and developed the methods used by the petitioner. There is evidence that the petitioner's business was successful. But the methods used by the petitioner had been originated and developed prior to the taxable years and McDonald and Gates had received substantial salaries and bonuses in prior years. The division of responsibility between McDonald and Gates *239 has been described in the findings of fact. We are told little more about their specific duties and services during the taxable years. The record shows that the increases in the petitioner's earnings were attributable in part to war conditions. The petitioner's fees were based on the payrolls of many clients who were engaged directly in war work. We are told in general terms that the petitioner rendered additional services and that the officers and some employees had to work overtime. We do not know how much they worked overtime. The Commissioner allowed substantial increases in the compensation of McDonald and Gates over their salaries and bonuses of preceding years. In our opinion the petitioner has failed to justify any further increases. We have given due consideration to the opinion testimony of several of the petitioner's employees, including all of the officers and directors except Gates, who did not appear as a witness. One of the employees was a personal friend of McDonald and Gates. He was on leave from his own electrical manufacturing business during the war years but had not been employed by the petitioner during the taxable years. These witnesses gave opinions to the *240 effect that the compensation in question was reasonable but their testimony does not add to our information concerning the services actually rendered by McDonald and Gates. Upon consideration of all the facts and circumstances of record we sustain the Commissioner's determination. Decision will be entered under Rule 50. Footnotes
*. Net income (or loss) after taxes is shown in next table with additional adjustments to surplus (or deficit).↩
*. The amounts in this column have been explained in part by the following footnote to petitioner's exhibit 4: In the beginning when contracts were signed, each contract was set up on the books at its estimated value in income. That is, that if it was estimated the contract would produce $1,000.00 in the coming year, the accounts receivable would be debited with $1,000.00 and income credited. It did not take long for us to realize that this system would not work because some of the estimated amounts were too much, some too little. Consequently, we revised the system of accounting, reversed the credits to income and charged surplus. From then on, accounts receivable were debited and income credited only at the time of billing and after the work had been performed.↩